UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISABETH Z., <br> Plaintiff, <br> v. <br> NANCY A. BERRYHILL, Acting Commissioner of Social Security Administration, <br> Defendant. | Case No. SA CV 17-489-SP <br><br> MEMORANDUM OPINION AND ORDER |

## I.

## **INTRODUCTION**

On March 17, 2017, plaintiff Elizabeth Z. filed a complaint against defendant, Commissioner of the Social Security Administration, seeking a review of a denial of period of disability and disability insurance benefits ("DIB"). The court deems the matter suitable for adjudication without oral argument.

Plaintiff presents one issue for decision, whether the Administrative Law Judge ("ALJ") properly rejected plaintiff's testimony. *See* Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 4-18; Memorandum in Support of Defendant's Answer ("D. Mem.") at 4-7.

1

Having carefully studied the parties' memoranda, the decision of the ALJ, and the Administrative Record ("AR"), the court concludes that, as detailed herein, although some of the ALJ's reasons were not clear and convincing, the ALJ provided two clear and convincing reasons for rejecting plaintiff's testimony. Consequently, the court affirms the decision of the Commissioner denying benefits.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was thirty-five years old on her alleged disability benefit onset date, has a bachelor degree and completed one quarter of the work required for a master degree. AR at 142, 921-22. She has past relevant work as a nurse and health educator. *Id.* at 947.

On May 17, 2005, plaintiff protectively filed an application for a period of disability and DIB. *Id.* at 142-44, 817. Plaintiff alleged she had been disabled since September 15, 2001 due to fibromyalgia, chronic fatigue syndrome, depression, and bilateral achilles tendonitis. *Id.* at 142, 244. The application was denied initially and upon reconsideration, after which plaintiff filed a request for a hearing. *Id.* at 127, 128-32, 134-37.

On September 11, 2007, plaintiff, represented by counsel, appeared and testified at a hearing before an ALJ. *Id.* at 769-89. The ALJ also heard testimony from a vocational expert. *Id.* at 785-89. On November 28, 2007, the ALJ denied plaintiff's claim for benefits. *Id.* at 36-42. The Appeals Council remanded the case for further review on April 6, 2010. *Id.* at 29-31.

On January 10, 2011, plaintiff appeared before the ALJ for another hearing. *Id.* at 790-808. On February 9, 2011, the ALJ again denied plaintiff's claim for benefits. *Id.* at 13-25. The Appeals Council denied plaintiff's request for review. *Id.* at 3-5. Plaintiff then appealed her case to this court. *Id.* at 841-44. In September 2013, this court remanded the case back to the agency for further

administrative proceedings, pursuant to the parties' stipulation. *Id.* at 846-50.

On December 16, 2014, plaintiff, represented by counsel, appeared and testified before another ALJ. *Id.* at 919-52. At the hearing, plaintiff informed the ALJ she was seeking disability benefits for the closed period between December 1, 2004 and April 2009. *Id.* at 929; *see id.* at 792-93. The ALJ also heard testimony from Glenn Griffin, a medical expert, and from Alan Ey, a vocational expert. *Id.* at 934-43, 946-52. On May 27, 2015, the ALJ denied plaintiff's application for benefits. *Id.* at 817-36.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity during the period of adjudication (since her alleged onset date of September 15, 2001 through her date last insured of December 31, 2004). *Id.* at 821. The ALJ noted plaintiff returned to work in April 2009. *Id.*

At step two, the ALJ found plaintiff suffered from the following severe impairments: fibromyalgia and obesity. *Id.*

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal the severity of one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1.[1] *Id.* at 827.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"),[2] and determined plaintiff had the RFC to perform light work except: she could only

---

[1] The Social Security Administration issued new regulations effective March 27, 2017. Unless otherwise stated, all regulations cited in this decision are to those effective for cases filed prior to March 27, 2017.

[2] Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

3

occasionally climb stairs, bend, balance, stoop, kneel, crouch, and crawl; she could not climb ladders, ropes, or scaffolding; and she needed to avoid concentrated exposure to heights, fast moving machinery, and temperature extremes of cold or heat. *Id.* at 827.

The ALJ found, at step four, that plaintiff was capable of performing past relevant work as a health educator. *Id.* at 835. The ALJ therefore concluded plaintiff was not suffering from a disability as defined in the Social Security Act at any time from September 15, 2001 through December 31, 2004. *Id.* at 835-36.

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council. *Id.* at 808A-11. The ALJ's decision stands as the final decision of the Commissioner.

## III.

### STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits. 42 U.S.C. § 405(g). The findings and decision of the Commissioner must be upheld if they are free of legal error and supported by substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended). But if the court determines that the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459. To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole,

"weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion." *Mayes*, 276 F.3d at 459. The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'" *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

## IV.

## **DISCUSSION**

Plaintiff argues the ALJ erred in rejecting her testimony. P. Mem. at 4-18. Specifically, she argues the ALJ failed to articulate clear and convincing reasons for the rejection. *Id.* at 4. The court disagrees and finds the ALJ properly rejected plaintiff's subjective complaints.

The ALJ must make specific credibility findings, supported by the record. Social Security Ruling ("SSR") 96-7p.[3] To determine whether testimony concerning symptoms is credible, the ALJ engages in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether a claimant produced objective medical evidence of an underlying impairment "'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if there is no evidence of malingering,

---

[3] "The Commissioner issues Social Security Rulings to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the SSA. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1203 n.1 (9th Cir. 2001) (internal citations omitted).

5

an "ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *accord Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014). The ALJ may consider several factors in weighing a claimant's credibility, including: (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346-47.

At the first step, the ALJ found plaintiff's medically determinable impairments could reasonable be expected to cause some of the symptoms alleged. AR at 830. At the second step, because the ALJ did not find any evidence of malingering, the ALJ was required to provide clear and convincing reasons for discounting plaintiff's testimony. Here, the ALJ discounted plaintiff's testimony because: (1) she made inconsistent statements; (2) her subjective reports of symptoms were not supported by objective evidence; and (3) there was evidence of noncompliance with medical advice and treatment. *Id.* at 828-29.

A.  **Law of the Case**

As an initial matter, plaintiff contends the ALJ erred in discounting plaintiff's testimony under the law of the case doctrine. When plaintiff was previously before this court, the court ordered the case remanded to the Commissioner based on the parties' Stipulation to Voluntary Remand. *See* case no. SA CV 12-1645-SP, docket nos. 28, 29. In the stipulation, the parties agreed that on remand the ALJ should be directed to, inter alia, "further evaluate Plaintiff's credibility" and "symptoms" in accordance with SSR 96-7p. *Id.*, docket no. 28 at 2. Plaintiff maintains this stipulation constitutes an acknowledgment that the ALJ's credibility assessment in the February 9, 2011 decision was not legally sufficient. Further, plaintiff argues that the credibility assessment in the instant ALJ decision gives the same reasons as the prior decision's assessment, and

therefore is necessarily erroneous under the law of this case. P. Mem. at 7-8.

"The law of the case doctrine generally prohibits a court from considering an issue that has already been decided by that same court or a higher court in the same case." *Stacy v. Colvin*, 825 F.3d 563, 567 (9th Cir. 2016) (citation omitted). This doctrine applies in the social security context. *Id.* For a prior ruling to become the law of the case, "the issue in question must have been decided explicitly or by necessary implication in the previous disposition." *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) (citation omitted).

Here, the parties' stipulation to remand the case was not an explicit decision by this court that the ALJ's initial evaluation of plaintiff's credibility was insufficient. The parties' stipulation agreed the ALJ should look at a number of issues, not just the issue of plaintiff's credibility, and made no explicit findings as to whether those issues had been erroneously decided. To conclude that the parties' agreement necessarily implies the initial evaluation of plaintiff's credibility was insufficient requires an unwarranted logical leap.

Even assuming the direction on remand necessarily implies the ALJ's initial consideration of plaintiff's credibility was insufficient, as defendant argues, the ALJ's credibility analysis here was not identical to the analysis in the 2011 decision. The ALJ included additional analysis in the 2015 opinion that was not included in the previous ALJ's 2011 opinion.

In 2011, the ALJ found plaintiff not credible due to plaintiff's internal inconsistent statements in a Function Report, inconsistent statements about her weight loss and weight gain to various physicians, and inconsistent statements about her living activities. AR at 19-20. The ALJ also found plaintiff's allegations with respect to her depression, poor memory, lack of concentration and focus, restless leg syndrome, and pain were not supported by objective evidence in the record. *Id.* at 20-21. Lastly, the ALJ noted evidence of noncompliance undermined plaintiff's credibility. *Id.* at 21.

In 2015, the ALJ noted largely the same reasons for discounting plaintiff's credibility. *See id.* at 828-30. But the ALJ did additional analysis with respect to plaintiff's mental abilities. Specifically, the ALJ noted even though plaintiff reported she frequently forgot her appointments, there was nothing to suggest she had significant problems with her memory. *Id.* at 829. Furthermore, the ALJ also noted plaintiff had provided a point-by-point rebuttal of the ALJ's previous decision, which had been more specific and persuasive than her own counsel's brief. *Id.* The ALJ further reasoned that if plaintiff's memory were as poor as she alleged, then she would have taken other steps to remember her appointments, such as writing down reminders. *Id.* This additional analysis bolstered the ALJ's evaluation of plaintiff's credibility. And as discussed below, the ALJ's finding that plaintiff did not adequately explain missing her appointments was a clear and convincing reason for discounting her testimony.

Accordingly, the law of the case does not determine whether the ALJ erred in her credibility analysis here. The court therefore turns to the reasons given by the ALJ for discounting plaintiff's testimony

**B.      Inconsistent Statements**

The ALJ identifies several instances of plaintiff's purported inconsistent statements. First, the ALJ notes plaintiff reported she was unable to leave her house alone, but she also stated she was able to go to doctor's appointments and to the store by herself on a regular basis without any assistance. *Id.* at 828. The ALJ was correct that plaintiff indicated in an October 21, 2005 function report she was "unable to leave [her] house at this time because [she] was taking medications that impair[ed] [her] judgment and reactions. *Id.* at 216. But in the same report, when plaintiff stated she regularly goes to doctor appointments and the store, plaintiff did not in fact indicate whether she goes to these places on her own. *See id.* at 218. The ALJ also noted plaintiff told a consultative examiner on August 5, 2010 she could travel by car and go out alone. *Id.* at 828 (citing *id.* at 762). But nearly five

8

years passed between plaintiff's October 21, 2005 function report and her August 5, 2010 statement to the consultative examiner, and by 2009 plaintiff was back to work and does not claim she was then disabled. Given the passage of time between the two statements, there is no inconsistency.

Second, the ALJ found plaintiff reported inconsistent weight gains and losses. AR at 828. In October 2010, plaintiff told a consultative examiner she had "gained a lot of weight because of medication," but also that her appetite had recently decreased and she lost ten pounds in one month. *Id.* at 762. This is not necessarily inconsistent, since plaintiff may have gained weight overall but subsequently lost weight in a specific month. The ALJ also noted plaintiff reported weight loss to some physicians and weight gain to others, citing various medical reports. *Id.* at 828 (citing *id.* at 331, 679, 733). On February 13, 2002, Dr. Geoffrey Dolan's report indicated plaintiff was "concerned regarding weight gain." *Id.* at 331. On February 24, 2008, Dr. Dolan noted a trial of Lyrica was associated with weight gain. *Id.* at 679. Six years passed between Dr. Dolan's two reports, and in any event, both reports indicate either a concern with weight gain or medication associated with weight gain. The ALJ also cites to a December 3, 2008 emergency room visit, at which the hospital reported plaintiff's endocrine was "negative for neck swelling, polydipsia, polyuria, polyphagia, and marked weight changes." *See id.* at 732-33. A reported lack of marked weight change in 2008 does not support the ALJ's point. Thus, there is no genuine inconsistency in plaintiff's reports of weight gain and loss.

Third, the ALJ also noted plaintiff reported pain symptoms during the closed period that limited her daily activities so she required assistance from friends to perform household chores, was bedridden as a result of pain symptoms for the majority of the day, and rarely left the house unless it was for a doctor's appointment. *Id.* at 828. The ALJ found this inconsistent with reports she walked a lot, ate a reasonable diet, and exercised as much as she could. *Id.* at 828 (citing

*id.* at 276, 691).

      Because the ALJ failed to cite to the record for plaintiff's testimony about her limited daily activities, the court can only guess as to which testimony she was referring. Plaintiff did not testify about her daily activities at her most recent December 10, 2014 hearing. *See id.* at 917-52. But plaintiff did testify about her limited daily activities in her previous supplemental hearing on January 10, 2011. *Id.* at 790, 799. She testified she would go back to sleep for three or four hours after taking her morning medication but tried to be awake when her daughter came home from school to spend time with her. *Id.* at 799. She would then watch a movie after her daughter's homework was done and she would go to sleep soon after that. *Id.* Plaintiff also testified she rarely left the house during the closed period, unless it was for a doctor's appointment. *Id.* at 799.

      Plaintiff told Dr. Minou Tran on January 31, 2006 she was concerned about her weight gain despite eating a reasonable diet and exercising as much as she could. *Id.* at 276. Although it certainly appears plaintiff spent many hours sleeping during this period, her testimony of spending time with her daughter and watching movies by no means indicates she was "mostly bedridden," as the ALJ characterized it, although it does suggest she spent very little time on her feet. There is some inconsistency between this testimony and plaintiff's statements to Dr. Tran she ate a reasonable diet and exercised as much as she could. Sleeping many hours of the day and eating a reasonable diet are not mutually exclusive, nor are sleeping many hours and exercising as much as possible when not in bed. Even so, plaintiff's testimony that she spent most of her time sleeping or watching movies and rarely left the house contrasts rather sharply with her statements to Dr. Tran that she exercised as much as she could.

      The ALJ also cites to an October 2009 report from St. Jude Medical Center which indicates plaintiff said she walked a lot. *Id.* at 691. But as plaintiff points out, this report is dated after the closed period end date of April 2009. It stands to

10

reason plaintiff's abilities had improved by then. Furthermore, this report is outside the timeframe of the relevant inquiry. There is thus no inconsistency.

Therefore, the ALJ's rejection of plaintiff's testimony because she made inconsistent statements was for the most part not supported by substantial evidence, although there was some inconsistency in her testimony as to how she spent her days versus her statements to her doctor of trying to exercise.

## C. Lack of Supporting Objective Medical Evidence

The ALJ found plaintiff's allegations of depression, restless leg syndrome, and pain were not credible because they were not supported by objective findings in the record. *Id.* at 828.

With respect to depression, the ALJ noted there is no evidence of any mental health treatment from September 15, 2001 thorough December 31, 2004, the date last insured. *Id.* at 823. She noted there are mental health records beginning in 2005, but this was after plaintiff's date last insured. *Id.* at 823, 825. Plaintiff seeks disability benefits for the closed period from December 2004 through April 2009, when she returned to work. *Id.* at 929. But to qualify, plaintiff's depression or other impairments must have begun before the date last insured of December 31, 2004. The records reflect plaintiff's depression did not.

At the December 16, 2014 hearing, the ALJ questioned the medical expert and plaintiff about records relating to plaintiff's depression. *Id.* at 935-44. The medical expert testified the records showed plaintiff suffered from major depressive disorder of moderate severity starting in November 2005. *Id.* at 935. He testified the psychiatric record then falls silent until August of 2010. *Id.* at 936. Plaintiff testified she saw Dr. Alan Liberman for depression. *Id.* at 943-44.

On November 9, 2005, Dr. Liberman examined plaintiff and diagnosed her with major depressive disorder and generalized anxiety disorder. *Id.* at 415. He noted plaintiff reported problems with concentration, organization, energy, and depression. *Id.* at 419. Dr. Liberman opined plaintiff would be severely limited

11

with respect to sustaining focused attention, and completing normal activities because she has had marked difficulty following and understanding billing instructions and appointment times at his office. *Id.* He noted plaintiff appeared so depressed and agitated he suspected she would not be able to adequately respond to the stresses common to a work environment. *Id.* at 420. Dr. Liberman does not indicate when he first began treating plaintiff. *See id.* at 415. But Dr. Liberman does report he first saw plaintiff for individual therapy "several years ago" and plaintiff was also court ordered to return to see him in 2005, although he does not have a copy of the exact date. *Id.* at 418.

The ALJ also noted Dr. Gregory Wolf completed a mental health assessment for plaintiff in August 2006. *Id.* at 824. She notes, "[a]lthough Dr. Wolf was advised this form pertained to the claimant's abilities on or before December 31, 2004, he stated his responses reflected *current* functioning." *Id.* But the forms clearly state Dr. Wolf is aware they represent plaintiff's abilities on or before December 31, 2004, and in addition, the assessment also reflects current functioning. *Id.* at 394, 395, 397. Dr. Wolf diagnosed plaintiff with fibromyalgia, chronic fatigue syndrome, depression, and alpha-delta sleep disorder. *Id.* at 395. He indicated any one of these alone would cause depression but the disorders combined caused overwhelming fatigue that would prevent plaintiff from working full-time at a sedentary position. *Id.* Dr. Wolf also opined plaintiff would have marked restrictions of activities of daily living, extreme difficulties in maintaining social functioning, marked deficiencies of concentration, persistence, or pace, and repeated episodes of decompensation, each of extended duration. *Id.* at 397.

The ALJ also noted Dr. Jeanette Townsend, a consultative psychologist, concluded plaintiff had major depression in partial remission in August 2010, and Dr. Charlene Kreig, another consultative psychologist, concluded in April 2014 there was no basis for any diagnosis. *Id.* at 825 (citing *id.* at 765, 909).

The ALJ assigned each of the above opinions little weight. *Id.* at 824-25,

831-32. Plaintiff does not challenge the ALJ's evaluation of these opinions. Without these rejected opinions, all of plaintiff's allegations of depression prior to the date last insured of December 31, 2004 are unsupported by the objective medical evidence in the record. The ALJ's mistaken belief that Dr. Wolf's mental health assessment forms only reflected current functioning, even though the forms state they also represent plaintiff's abilities prior to December 31, 2004, is moot because the ALJ assigned Dr. Wolf's report little weight.

The ALJ also found a lack of evidentiary support for plaintiff's allegations of restless leg syndrome. *Id.* at 828. She noted plaintiff participated in a sleep study on April 16, 2003, and no periodic limb movements were seen. *Id.* at 827 (citing *id.* at 338). Dr. Peter Fotinakes confirmed this observation in a July 2003 report, and further noted plaintiff's husband never noticed limb movements when plaintiff slept. *Id.* at 534. But Dr. Fotinakes also noted while it was interesting plaintiff did not manifest periodic limb movements when sleeping, this occurs in 15% of restless leg syndrome patients. *Id.* at 536. Dr. Fotinakes opined plaintiff's restless leg syndrome was exacerbated from Zyprexa and Fentanyl. *Id.* When plaintiff abruptly discontinued Fentanyl, her restless leg syndrome underwent extreme exacerbation. *Id.* Dr. Fotinakes therefore switched plaintiff's medication. *Id.* During a July 30, 2003 follow-up appointment, plaintiff reported Mirapex alleviated her restless legs. *Id.* at 539. Dr. Fotinakes recommended plaintiff continue taking Mirapex and then stopping the medication to see if there was recurrence of restless leg syndrome. *Id.* During a September 16, 2003 follow-up appointment, plaintiff reported she discontinued Mirapex twice and experienced recurrence of restless legs both times. *Id.* at 538. Dr. Fotinakes therefore recommended plaintiff continue her current medication regimen. *Id.* He reported plaintiff was doing well with her nocturnal sleep and was happy with her regimen. *Id.*

Therefore, although the ALJ was correct that plaintiff's restless leg

syndrome was not supported by objective medical evidence, that was not a clear and convincing reason to discount plaintiff's allegations. Plaintiff's allegations of restless leg syndrome were well-supported by the record given that Dr. Fotinakes noted 15% of such patients experience no periodic limb movements during sleep and therefore objective medical evidence is not required. Furthermore, the record reflects a possible diagnosis of restless leg syndrome as early as January 25, 2002. *Id.* at 323.

With respect to plaintiff's allegations of pain, the ALJ found her complaints were not well-supported by objective findings. *Id.* at 828. The ALJ noted despite various complaints of pain in the back, neck, shoulders, and hips in the medical record, several examinations and assessments revealed plaintiff had a full range of motion in her neck, lower extremities, cervical spine, shoulders, elbows, wrists, hands, and hips. *Id.* at 828-29 (citing *id.* at 276, 332, 440). As such, the ALJ concluded the majority of the physical findings demonstrated good function and suggested plaintiff's complaints of debilitating pain were exaggerated. *Id.* at 829.

But range of motion is not determinative as to whether plaintiff's allegations of pain are credible. The ALJ found plaintiff suffers from fibromyalgia, and cited the ample evidence in the record to support this finding, including multiple instances in which plaintiff was found to have between thirteen and eighteen of eighteen positive tender points. *Id.* at 822. That there is no additional objective evidence to support the severity of her pain is not a basis to discount it. Indeed, fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Benecke v. Barnhart*, 379 F.3d 587, 590 (9th Cir. 2004). As such, purported lack of objective medical evidence was not a clear and convincing reason to discount plaintiff's complaints of pain.

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005). Here, the lack of

14

supporting medical evidence provided a clear and convincing reason for the ALJ to reject plaintiff's subjective statements as to her depression, but not as to her physical impairments.

**D.      Noncompliance with Treatment**

The ALJ found the record showed significant non-compliance with plaintiff's treatment regimen, including failure to take prescribed medications and failure to appear at scheduled appointments. AR at 829 (citing *id.* at 367, 426, 446, 590, 608, 609, 688). The ALJ also noted plaintiff was discharged from physical therapy because of the frequency of cancelled appointments, chronic tardiness, and poor effort. *Id.* (citing *id.* at 446). She reasoned if plaintiff's symptoms were truly as severe as alleged, she would have followed medical advice and treatment to ensure maximum benefit. *Id.* The failure to follow a treatment plan may be a clear and convincing reason for discounting a claimant's credibility. *See Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) ("the individual's statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").

The ALJ cited to Dr. Liberman's report, which noted plaintiff cancelled several appointments because she was too ill to attend. AR at 367. As plaintiff points out, these are not unexplained cancellations. Furthermore, the record only reflects one instance on January 31, 2008 or February 8, 2008 when plaintiff did not take her blood pressure medication, which does not show significant failure to follow the medication regimen. *Id.* at 688.

The ALJ cited to two unexplained appointment cancellations and no-shows on February 11, 2002 and January 28, 2004, which were prior to the closed period of disability, but also prior to the date last insured, and therefore during a relevant period. *See id.* at 426, 606. An April 26, 2002 progress note for physical therapy states plaintiff had cancelled many appointments and was chronically late to

15

appointments. *Id.* at 446. Given this, plaintiff was put on hold from physical therapy until she consulted her physician. *Id.*

The ALJ's record citations during the closed period are from December 2004 through March 2005. *Id.* at 608, 609, 688. These records show plaintiff either cancelled or missed seven appointments with Dr. Wolf on December 7, 2004, January 5, 10, 11, 12, and 14, 2005, and March 1, 2005. *Id.* at 608, 609. The March 1, 2005 cancellation was reportedly due to plaintiff's daughter's illness, but the record does not otherwise reflect why plaintiff cancelled or missed her appointments. A note from Dr. Liberman states plaintiff met with him only sporadically due to financial limitations, but this fails to explain plaintiff's missed appointments with Dr. Wolf without explanation. *See id.* at 347. And while Dr. Liberman opined plaintiff missed appointments due to her marked impairment in mental functioning, as discussed above, the ALJ assigned Dr. Liberman's opinion little weight, which plaintiff does not challenge.

Moreover, there is no other medical evidence that would attribute plaintiff's failures to go to her appointments to mental impairment rather than her own personal preference or lack of commitment. *See Molina*, 674 F.3d at 1104. Indeed, the ALJ noted that although plaintiff claimed she frequently forgot appointments, the ALJ found no evidence plaintiff had any significant problem with her memory. AR at 829. The ALJ also observed plaintiff seemed bright and focused, which was partly shown through her detailed rebuttal of the Commissioner's previous decision. *Id.* (citing *id.* at 90-97).

Plaintiff argues these missed appointments are fairly minimal because the closed period ranges from December 2004 through April 2009. P. Mem. at 16. The court disagrees. Plaintiff missed seven appointments, not an insignificant number, without explanation during a four-month period. *See Calisti v. Colvin*, 2015 WL 7428727, at *2 (E. D. Cal. Nov. 23, 2015) (the ALJ properly considered plaintiff's five missed appointments during a span of three months); *see also*

*Robinson v. Colvin*, 2013 WL 2429652, at *12 (C.D. Cal. June 4, 2013) (ALJ properly discounted plaintiff's credibility because she failed to report to eight appointments during a 1.5-year time period). Furthermore, it appears plaintiff may have also cancelled additional appointments on May 25, 2005, May 31, 2005, and June 17, 2005, as the record indicates plaintiff rescheduled these appointments. AR at 614. Taken together, this failure to attend her appointments suggests her pain and other symptoms were not as severe as she claims. Therefore, the ALJ's reason for rejecting plaintiff's testimony regarding her pain and other symptoms due to noncompliance with her treatment regimen is clear and convincing and supported by substantial evidence.

      As such, while substantial evidence did not support the ALJ's rejection of plaintiff's testimony due to inconsistent statements (with one exception) or lack of objective evidence of her physical impairments, substantial evidence does support her rejection of plaintiff's testimony because of lack of evidence to show she suffered from depression before the date last insured, and because of her noncompliance with treatment. These were clear and convincing reasons for the ALJ to find plaintiff's allegations not fully credible. The ALJ's flawed credibility analysis with respect to inconsistent statements and physical impairment evidence was therefore harmless. *See Stout v. Commissioner, Social Sec. Admin*, 454 F.3d 1050, 1055 (9th Cir. 2006) (error is harmless "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion").

//
//

## V.
## **CONCLUSION**

IT IS THEREFORE ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits, and dismissing the complaint with prejudice.

DATED: March 29, 2019

SHERI PYM
United States Magistrate Judge